STATE OF VERMONT
ENVIRONMENTAL COURT

|                                                          |   |                              |
|----------------------------------------------------------|---|------------------------------|
|                                                          | } |                              |
| **Land Use Panel of the**                                | } |                              |
| **Natural Resources Board,**                             | } |                              |
| **Petitioner,**                                          | } |                              |
|                                                          | } |                              |
| **v.**                                                   | } | **Docket No. 188-9-05 Vtec** |
|                                                          | } |                              |
| **James F. Sheldon,**                                    | } |                              |
| **Respondent.**                                          | } |                              |
|                                                          | } |                              |

## Decision

This matter concerns the already completed development of a parcel of land on Vermont Route 30 in the Town of Pawlet (Town). The issue presented in this proceeding is whether the development requires an Act 250 permit. For the reasons more particularly stated below, the Court concludes that the development includes a commercial component and thus requires an Act 250 permit.

The matter was heard on the merits before Environmental Judge Thomas S. Durkin on December 15, 2005. The parties thereafter submitted post-trial memoranda on issues raised at the trial; the matter became ripe for the Court's consideration on February 1, 2006.

The Land Use Panel of the Vermont Natural Resources Board (Panel) is represented in this proceeding by Thomas G. Walsh, Esq.; Respondent James F. Sheldon is represented in this proceeding by Elizabeth Boepple, Esq. No other party participated or appeared in this proceeding.

The proceedings against Respondent began on an administrative level, with the Panel filing its Administrative Order on September 12, 2005. Respondent timely filed a request for hearing, pursuant to 10 V.S.A. § 8012(c). At the parties' request and pursuant to the Scheduling Order of September 15, 2005, and the Amended Scheduling Order of November 15, 2005, the Court extended the time periods required under 10 V.S.A. § 8012(c) to allow the parties to complete any necessary discovery and submit pre-trial filings.

We note for purposes of satisfying 10 V.S.A. § 8012(c)(2) that the following statutes and rules are applicable to this proceeding, in addition to the Administrative Order noted above: 4

V.S.A. Chapter 27 (governing the Environmental Court); 10 V.S.A. Chapter 151 (governing Land Use and Development, commonly referred to as Act 250); and 10 V.S.A. Chapter 201 (governing Environmental Enforcement).

Based upon the admitted evidence presented at trial, including the parties' Stipulation of Undisputed Facts, the Court makes the following factual findings:

**Findings of Fact**

1.  Respondent acquired a parcel of land, consisting of about five acres, on October 26, 2004. The parcel lies on the westerly side of Route 30; it is this parcel that is the subject of these proceedings (Subject Parcel).

2.  The Subject Parcel is adjacent to a 300± acre parcel of land owned by Respondent's immediately family members that is known as their family homestead.

3.  Since the early 1970s and continuously thereafter, Respondent or members of his family have owned and operated several businesses from the family homestead.

4.  Respondent currently has an excavation business, known as Jim Sheldon Excavating, Inc., and a related subsidiary business known as Sheldon Jacking and Moving. The excavation business provides earth moving services to a variety of customers throughout the Bennington and Rutland County regions. The related jacking and moving business provides house and structural relocation services. Respondent's businesses are similar to those businesses previously operated by other family members from the family homestead.

5.  Respondent began operating his businesses from the family homestead property. During the 2003 calendar year, Respondent and his family discussed the sale of the family homestead, where Respondent was then living and from which Respondent was then operating his businesses.

6.  Respondent then began to investigate development of the Subject Parcel. On or about August 21, 2003, Respondent received a zoning permit from the Pawlet zoning administrator to construct a 120´ x 80´ house/barn on the Subject Parcel.

7.  The Town has adopted zoning bylaws, but has not yet adopted permanent subdivision regulations.

8.  The subject property is located in the Agricultural/Rural Residential zoning district.

9.  After receiving the 2003 zoning permit, Respondent constructed the house/barn structure (Project Building) on the Subject Parcel. The Project Building is tan in color with some white

2

trim. It has large, uninterrupted vertical walls. Its design and construction has more in common with a new barn or commercial structure than a residence.

10. The Project Building is 120 feet long, 80 feet wide and 30 feet high. The footprint of the building is 9,600 square feet. The south side of the building contains two interior floors. The combined square footage of this space is 4,800 square feet. The total usable area within the Project Building is about 12,000 square feet.

11. The north side of the Project Building consists of a single story open area measuring 120 feet long by 60 feet wide and having an 18-foot-high interior ceiling. This area is heated; the interior walls are finished with painted sheetrock, wood and shelving. There are two large doors on either end of this area. Each of these four doors is sixteen feet wide and fourteen feet tall. The floor is poured concrete with a floor drain that feeds into a holding tank.

12. The floor drain is located in the center of the open area and is connected to a holding tank by about 90 feet of pipe running under the poured concrete floor to the rear of the Project Building where the holding tank is buried in the gravel drive area. The capacity of the holding tank is about 1,000 gallons. It is made of concrete and sealed with hydraulic cement. When the holding tank needs to be emptied, Respondent plans to use a company that specializes in pumping and disposing of liquid runoff or leaks from barns and residential garages.

13. As of the date of the site visit and trial, three quarters of the floor space within this open area on the northern end of the Project Building is used exclusively for the storage of Respondent's personal belongings, including three antique tractors, a 1987 Buick Grand National, several four-wheel off-road vehicles, a twenty-nine-foot power boat, an outdoor gas cooking grill, a mountain bike and assorted large personal items typically stored in a residential garage or barn.

14. As of the date of the site visit and trial, Respondent used about one quarter of the floor space in this open area, or about 1,800 square feet, to store and maintain vehicles and equipment owned and used in connection with his businesses: Jim Sheldon Excavating, Inc., and Sheldon Jacking and Moving. Respondent also stores several business vehicles on the gravel drive and parking area that circles the Project Building.

15. This large open area also contains a utility closet in its northwest corner. This closet holds an air compressor, steam cleaner and central vacuum, all of which Respondent uses for residential and business purposes.

16.     Through his businesses, Respondent employs two full-time employees (not including Respondent) and a part-time office staff person. Respondent's employees live off-site and park their personal vehicles on the Subject Parcel during working hours.

17.     Respondent's part-time office staff person, Mandy Brown Smith, generally completes whatever administrative tasks Respondent requires. Ms. Brown's duties include running errands, cleaning, answering the telephone and bookkeeping. The hours for which Respondent employs Ms. Brown vary from day-to-day and week-to-week, depending on the tasks required on a given day.

18.     Ms. Brown works out of an office located on the first floor of the eastern end of the residential portion of the Project Building. This office measures 20´ x 20´. It has an exterior door on the east side, facing Route 30, a door to an adjoining bathroom and another interior door to the open storage area.

19.     A walkway leads from the front driveway to the office entrance door. Two desks, each with a computer, are located in the office.

20.     At times, Ms. Brown, while completing employment tasks for Respondent, works at either of the two office desks and uses the office's bathroom.

21.     The balance of the first floor residential space contains an entranceway and door in the south west corner, a mechanical room containing the furnace, water heater, electrical panels, cable television access, telephone and alarm systems for the entire structure, a laundry room, two bedrooms, a living and dining area, full bathroom, and kitchen with an exterior door to the south.

22.     The second floor of the residential area is framed and insulated, but not yet sheetrocked. Respondent does not currently use this second floor area, but has plans to complete it for use as a guest bedroom, additional bathroom, exercise room and open entertainment area with an exterior door that will open onto a not-yet-constructed 20´ x 16´ second story deck.

23.     Of the 12,000 square feet of interior floor space, Respondent uses approximately 9,600 square feet for his personal residence and storage of personal equipment and pleasure vehicles. This equals 80% of the entire square footage of the interior of the Project Building. Respondent uses the remaining 2,400 square feet (20% of the interior) for his business operations, including his business office and the storage and maintenance of his business vehicles and equipment.

24.     Respondent has no other location from which he operates his businesses, other than his customers' job sites. Respondent stores his commercial equipment in no other locations, other than his customers' job sites.

25.     The evidence at trial that related to how Respondent earns his living was limited to the businesses Respondent conducts and maintains from the Subject Parcel. The Court therefore concludes that the businesses Respondent operates from the Subject Parcel represent the sole or major source of Respondent's income.

26.     The Mettowee River is located adjacent to the Subject Parcel and runs along its southern boundary lines. Respondent placed rip rap on the slope leading to the river. The closest point on the toe of the slope where the rip rap is located is about twenty feet from the water's edge.

27.     Respondent served as his own engineer in the design of erosion control measures for the Project Building and its construction. He installed a silt fence to prevent run-off into the Mettowee River before he began construction and lined the river bank with "shot rock" for ongoing erosion control mitigation.

28.     Respondent also served as his own architectural designer for the exterior and interior layout of the Project Building, its driveways and parking areas. The driveways provide access to the following areas on the Subject Property: (a) the parking area in front of the office; (b) the two large overhead doors on the eastern side of the building; (c) along the Building's northern wall; (d) the two large doors on the western end of the building; and (e) a large parking area in the rear, near the Mettowee River.

29.     Respondent's rear parking area is within 20 feet of the top of the bank of the Mettowee River. It is in this parking area where Respondent sometimes parks his excavation vehicles.

30.     State regulations require a minimum buffer area of fifty feet from the top of a river or stream bank, consisting of an undisturbed, naturally vegetated area. Special circumstances within a project site sometimes require a larger buffer and will sometimes allow for a smaller buffer. Respondent did not offer evidence of such special circumstances existing at his site.

31.     Respondent also designed the heating system for the Project Building, including a wood-burning furnace that is housed in a separate shed on the Subject Parcel, located fifty feet or more to the southwest of the Project Building. Respondent estimated that the furnace burns about 14 cord of wood per heating season in order to provide adequate heat to the Project Building.

32. The Project Building uses the pre-existing septic system that was constructed to support a single-family mobile home that once existed on the Subject Parcel.

33. There was no evidence offered at trial that the pre-existing septic system conforms with the State waste disposal regulations for a combined residential/commercial facility such as Respondent's.

34. In the course of his work for customers, Respondent sometimes assumes the responsibility of determining what permits are required for his customers' projects. To fulfill this responsibility, Respondent has in the past made disclosure and inquiry to municipal and state authorities to determine what permits may be required for a given customer's project.

35. Prior to his commencement of construction, Respondent made no inquiry of Act 250 officials to determine whether his proposed development would require an Act 250 permit. Respondent rejected the initial suggestions and subsequent demands of Act 250 officials that he comply with the requirement that his proposed development obtain an Act 250 permit.

36. While Respondent was constructing the Project Building in 2004, he was contacted by William Burke, the District 1 Act 250 Coordinator. Mr. Burke approached Respondent in response to an anonymous complaint that Respondent was constructing a commercial structure without first obtaining an Act 250 permit. Respondent denied that the structure he was building required an Act 250 permit.

37. As a consequence of Respondent's denial, Mr. Burke sought out further investigation of Respondent's construction and development activities by Environmental Enforcement Officer (EEO) Donald Gallus

38. EEO Gallus visited the subject property on several occasions in 2005 and spoke with Respondent. At the time of EEO Gallus's site visits, Respondent was not yet living at the Subject Building, as its construction was not yet completed. Respondent was operating his businesses from the Subject Parcel at the time of EEO Gallus's visits. In the course of his visits, EEO Gallus observed a loader and other business equipment located in and around Respondent's building. Mr. Gallus also observed the floor drain installed by Respondent and what appeared to be a power sand & gravel screener located toward the front of the Subject Parcel with a pile of screening material nearby.

39. In the course of his investigation, EEO Gallus visited the Pawlet Town Clerk's Office, during which time he determined that the Town Listers had listed Respondent's use of the Subject Property as "commercial."

40. In response to EEO Gallus's investigation, Respondent continued to deny that his construction and use of the Project Building required an Act 250 Permit.

41. District Coordinator Burke and EEO Gallus thereafter referred their investigation of Respondent's activities to Patricia Moulton-Powden, Chair of the Natural Resources Board and its Land Use Panel. The Panel's responsibilities include enforcement of the provisions of Act 250.

42. As a consequence of Respondent's activities and his continued denial that his project required an Act 250 permit, the Panel issued the Administrative Order (AO) that forms the basis of this enforcement action. In response to the AO, Respondent requested a hearing before this Court, as is a respondent's right under 10 V.S.A. § 8012.

43. Coordinator Burke, EEO Gallus and Chair Moulton-Powden have expended the following amounts of time in connection with the investigation and enforcement concerning Respondent's complained-of activities (not including the time spend during or after trial): Coordinator Burke: 8 hours, chargeable at the rate of about $29.00 per hour; EEO Gallus: an unspecified amount of time during his two site visits, consultation with others, and visit to the Town Clerk's Office; and Chair Moulton-Powden: 3.5 hours, chargeable at the rate of $41.00 per hour. Each of these three individuals also traveled to and participated in the Court's site visit and bench trial, which the Court estimates took about 8 hours.

44. Panel officials requested that Respondent voluntarily accept service of the AO, but he refused. The Panel thereafter incurred the following costs, up to (but not including) the time of trial and thereafter: Attorney's fees and expenses in the amount of $3,412.23 and sheriff service fees of $60.95.

## Conclusions

The primary and perhaps sole legal issue in this contested enforcement proceeding is whether Respondent's construction and use of the Project Building requires an Act 250 permit. We conclude that it does, for the reasons more particularly stated below.

Act 250, Vermont's state-wide land use development law, 10 V.S.A. Chapter 151, defines the circumstances under which some commercial, residential, subdivision and other significant land use development projects are required to obtain what is commonly referred to as an Act 250 Permit. Developers of projects which come under Act 250 jurisdiction must show that their land use projects conform to 10 criteria (and sub-criteria), some of which require that there be a showing that a project will not unduly or adversely impact neighboring streams, water sources, traffic, agricultural areas or neighborhoods. See 10 V.S.A. § 6086(a).

The circumstances under which Act 250 jurisdiction is triggered are defined in 10 V.S.A. § 6001(3)(A). The subsection relevant to Respondent's activities here defines "development" as the "construction of improvements for commercial or industrial purposes on more than one acre of land within a municipality that has not adopted permanent zoning and subdivision bylaws." 10 V.S.A. § 6001(3)(A)(ii). Since it is undisputed here that the Subject Parcel is greater than one acre and that the Town has yet to adopt both zoning and subdivision bylaws, our focus turns to whether Respondent has constructed "improvements for commercial . . . purposes . . . ."

The facts that govern our legal conclusion here were largely undisputed at trial. Respondent uses 20% of the 12,000 square-foot structure solely for the commercial purposes related to the operation of his two businesses. This equates to an area exclusively devoted to commercial activity of 2,400 square feet. While this area is only a small portion of Respondent's rather large structure, we cannot conclude that a 2,400 foot commercial structure, standing alone, would escape Act 250 jurisdiction. We therefore find it illogical to conclude that such a structure, when commingled with Respondent's residence, should avoid Act 250 review.

Respondent suggests that this Court, in exercising its limited equitable powers, should adopt a *de minimus*[1] exception to the "commercial purposes" definition of development governed by Act 250. While our Supreme Court has touched upon this subject, we decline to visit this legal issue, for the basic reason that the evidence here shows that Respondent's activity can in no way be defined as a trifling matter. See In re Audet, 2004 VT 30, ¶ 11, 176 Vt. 617, 619 (recognizing that a de minimus exception in Act 250 proceedings "would be error," the Court concluded that under "Act 250 and environmental board rules, any [commercial] construction activity, no matter how minute, triggers Act 250 jurisdiction." (internal citations omitted))

---

[1] Short for *de minimus non curat lex:* the law does not care for, or take notice of, very small or trifling matters. Black's Law Dictionary 464 (8th ed. 1999).

As noted above, the portion of Respondent's improvements solely devoted to his commercial businesses encompassed 2,400 square feet. The evidence (and lack of contradictory evidence) tended to show that the commercial activities operated within the Project Building constituted most, if not all, of Respondent's income source. There was no other location identified from which Respondent operates his businesses.

Respondent often noted that the work for which his customers pay him is all done "off-site" from the Subject Parcel. But the very nature of his businesses—excavation activities and the jacking and moving of buildings—must by definition occur on the customers' job site and not at Respondent's business office. We note that the Supreme Court rejected a similar argument in a recent challenge to an Act 250 jurisdictional determination. See In re Appeal of Cota, Docket No. 2005-120 (Vt., March 29, 2006) (unpublished, mem.). The Court deferred to the determination of the Environmental Board (i.e.: the administrative predecessor to the Natural Resources Board), and held that storing and maintaining excavation materials at a property, as well as maintaining a business office on the same property, meets the statutory definition of "commercial purpose." Id. at 3. We see little difference from the Respondent's business activities here and the appellant's in Cota.

For all these reasons, we conclude that Respondent's improvements to the Subject Parcel were completed in part for commercial purposes, cannot be defined as *de minimus*, and therefore fit Act 250's definition of "development" in 10 V.S.A. § 6001(3).

Any development that fits the definitions within § 6001(3)(A) must first obtain an Act 250 permit prior to the commencement of construction. 10 V.S.A. § 6081(a). Respondent choose to not obtain such a permit, even after being advised to do so by Coordinator Burke and EEO Gallus, and so declined even after being directed to do so by the AO at issue here. We conclude that Respondent's refusal to first obtain an Act 250 permit does not have legal foundation. We therefore conclude that Respondent violated § 6081(a) of Title 10. The Land Use Panel's AO must be upheld.

### Determination of Penalties (10 V.S.A. § 8012(c)(3))

In light of our conclusion that respondent violated § 6081(a), we now address the Land Use Panel's claim for penalties. The claim for penalties here is brought under the provisions of the Uniform Environmental Law Enforcement Act, 10 V.S.A. Chapter 201. The Panel, in

conjunction with the Secretary of the Agency of Natural Resources, is authorized to bring enforcement actions, such as the action here, for violations of Act 250. See 10 V.S.A. §§ 8003(a)(10), 8004.

When a respondent requests that this Court conduct a hearing on an AO, the Court is directed to make its own independent determination of the appropriateness of any penalty by considering the eight criteria set forth in 10 V.S.A. § 8010(b). In the case at bar, we arrive at the following conclusions in relation to those criteria:

1. The actual or potential impact on public health, safety welfare and the environment resulting from Respondent's construction activities is minor, although not insignificant. Respondent's construction activities and established parking area comes within twenty feet of the Mettowee River. Respondent arrived at this design without the benefit of consulting someone with experience in stream buffers or effective erosion control measures. Respondent also did not conduct any discernable traffic analysis, asserting that his development was for the most part residential; however, his base of operations and the area where he most often parks his excavation vehicles is along Route 30, a sometimes busy state highway. His residence and business premises are heated by a wood furnace that burns 14 cord of firewood each heating season. There is potential for an impact on the region's air quality, but we are left to wonder about the significance of such impact, given that Respondent took steps to avoid the regulatory review that would answer such queries. The last, but by no means minimal source of potential impact upon public health and safety, is Respondent's decision to use the pre-existing waste disposal system, of unspecified age, that served the mobile home that once existed on the Subject Parcel. Respondent put forth no evidence, and apparently made no inquiry, of the adequacy of this waste disposal system to serve his new development.

2. Circumstances which mitigate against the imposition of penalties here are present but are not significant. Respondent has experience in excavation activities, as it is his profession, and presumably relied upon that experience in placing the rip rap and "shot rock" along the bank of the Mettowee River. There was no evidence, however, that such measures conformed to generally accepted erosion control practices; there was some evidence presented, and put into context by the site visit, that erosion along the river bank has occurred, due the narrow buffer and closeness of the rear parking area.

Coordinator Burke, EEO Gallus and the Land Use Panel staff acted promptly to complaints in regards to Respondent's activities; no unreasonable delay occurred in the Land Use Panel's enforcement efforts.

3. Respondent knew or should have known that this violation existed. He testified to his experience at investigating for clients what permits may be needed for their development projects. He chose to conduct no such investigation of his own project. He could have conducted this investigation by merely making inquiry of the local district coordinator but choose not to do so. His actions on his own project did not follow the practice he had established for his clients. Moreover, once Respondent received notice that his project may require an Act 250 permit, he rejected efforts to bring him into voluntary compliance. Contesting the Land Use Panel's AO is Respondent's right, but it is also his responsibility to put forth evidence that he had a legal and factual foundation for his challenge. Respondent has failed to do so here.

4. No evidence was presented that Respondent was found to have previous environmental or land use violations. The absence of such prior violations helps mitigate against some portion of the penalties in this case.

5. Respondent gained an economic benefit from his refusal to comply with the provisions of Act 250. This benefit was derived from not having to pay an application fee and not having to hire one or more professional consultants on issues of erosion control, traffic, waste disposal and impacts on air quality. While the specific amount of this benefit was not deduced at trial, the evidence revealed that it was in the thousands of dollars. Even though Respondent will incur these expenses if and when he seeks an Act 250 permit for his development, the economic benefit he received thus far is an aggravating factor in regard to penalties.

6. The Land Use Panel suggested in its pretrial filing that the Court should impose an additional penalty of $1,000.00 as a deterrent effect upon respondent to come into compliance with the law. Testimony at trial convinced the Court that Respondent requires a more substantial deterrence. At trial, Respondent remained adamant that he had the right to develop his property as he did, without the interference of the state permitting system. There was an absence of acknowledgement by Respondent of the potential impact of his commercial development upon his neighbors, other surrounding

lands, or the environment in general. Further, had Respondent followed the route of compliance, it is reasonable to conclude that the time and expense he exerted, and caused the Land Use Panel to exert, would have been considerably less than the time and expense expended in this contested hearing.

7. The Land Use Panel incurred costs up until the trial that totaled over $4,000.00, plus out-of-pocket expenses for sheriff service fees of $60.95. Due to the Court's observation of time expended during trial, the Court concludes that the Panel incurred additional costs of over $2,000.00, leading us to conclude that the Panel incurred costs directly related to Respondent's violation in excess of $6,060.95.

8. Respondent's violation began in 2004 when he commenced construction and continued through the date of trial. There was no evidence offered at trial of any attempts made by Respondent to come into compliance with Act 250.

Based upon the determinations made on the above penalty criteria, the Court concludes that Respondent should be assessed a penalty under criteria 1 through 5 & 8, inclusive, of $2,000.00; under criterion 6 of $2,000.00 and under criterion 7 of $6,060.95, for a total of $10,060.95.

## Summary of Determinations

For all the reasons stated above, the Court hereby determines that Respondent violated 10 V.S.A. §§ 6001(3)(A)(ii) and 6081(a). For these same reasons, the Court **AFFIRMS** sections A through D, inclusive, of the Administrative Order (see pages 2 – 3), subject to the rights of appeal or stay noted below and subject to the amendment that the deadlines for compliance shall run from the date of this Decision. Lastly, the Court vacates the penalty provision in the Administrative Order (section E) and replaces it with penalties against Respondent and payable to the Land Use Panel in the total of **$10,060.95**, payable within 30 days of this Decision, subject to rights or appeal or stay.

## Rights to Appeal

All parties to this proceeding have the right to appeal this Decision. Such appeal must be filed with this Court with 10 (ten) business days of when the appealing party receives this Decision, pursuant to 10 V.S.A. § 8012(c)(5). If no appeal is filed within such 10 business days, this Decision shall become final. Id. Anybody having questions regarding the appeals process

should consult the Vermont Rules of Appellate Procedure (V.R.A.P.) and the Vermont Rules for Environmental Court Proceedings (V.R.E.C.P.).  A party may also petition the Supreme Court for a stay under the provisions of V.R.A.P. 8 and V.R.E.C.P. 5(k).

A Judgment Order accompanies this Decision.


Done at Berlin, Vermont this 28th day of July, 2006.


_____
Thomas S. Durkin, Environmental Judge